1  Steven N. Williams (State Bar No. 175489)
   Victor S. Elias (State Bar No. 262269)
2  COTCHETT, PITRE & McCARTHY, LLP
   840 Malcolm Road
3  Burlingame, CA 94010
   Telephone: 650-697-6000
4  Fax: 650-697-0577
   *Attorneys for Intervening Government Entities*
5
   Richard M. Heimann (State Bar No. 063607)
6  Lexi J. Hazam (State Bar No. 224457)
   Robert L. Lieff (State Bar No. 037568)
7  (Of Counsel)
   LIEFF, CABRASER, HEIMANN
8  & BERNSTEIN, LLP
   Embarcadero Center West
9  275 Battery Street, 29th Floor
   San Francisco, CA  94111-3339
10 Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008
11 *Attorneys for Plaintiff/Relator*

12 (Additional counsel on signature page)

13                  UNITED STATES DISTRICT COURT

14        NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

15 In re BANK OF NEW YORK MELLON          CASE No.  C-11-05683 (WHA)
   CORPORATION FALSE CLAIMS ACT
16 FOREIGN EXCHANGE LITIGATION,           **EX. REL. THIRD AMENDED**
   *Ex rel.* FX ANALYTICS, LOS ANGELES    **COMPLAINT FOR VIOLATION OF THE**
17 COUNTY EMPLOYEE RETIREMENT             **STATE FALSE CLAIMS ACT AND**
   ASSOCIATION, LOS ANGELES               **COMPLAINT IN INTERVENTION ON**
18 DEPARTMENT OF WATER & POWER            **BEHALF OF LOS ANGELES COUNTY**
   RETIREMENT PLAN, SAN DIEGO             **EMPLOYEE RETIREMENT**
19 COUNTY EMPLOYEES RETIREMENT            **ASSOCIATION, LOS ANGELES**
   ASSOCIATION, AND STANISLAUS            **DEPARTMENT OF WATER & POWER**
20 COUNTY EMPLOYEE RETIREMENT             **RETIREMENT PLAN, SAN DIEGO**
   ASSOCIATION,                           **COUNTY EMPLOYEES RETIREMENT**
21                                        **ASSOCIATION, AND STANISLAUS**
                  Plaintiff/Relator,      **COUNTY EMPLOYEE RETIREMENT**
22                                        **ASSOCIATION**
          v.
23                                        **1. Violation of Cal Govt. Code § 12651 *et seq.***
   THE BANK OF NEW YORK MELLON            **2. Unjust Enrichment**
24 CORPORATION, BANK OF NEW               **3. Breach of Fiduciary Duty**
   YORK MELLON TRUST COMPANY,             **4. Breach of Contract**
25 N.A., and DOES 1 through 100, inclusive, **5. Fraud by Concealment**
                                          **6. Violation of Cal. Bus. & Prof. Code §17200**
26                Defendants.
                                          **DEMAND FOR JURY TRIAL**
27

28

---

IN RE FALSE CLAIMS ACT FOREIGN EXCHANGE LITIGATION
C-11-05683 (WHA)

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.     PARTIES        ................................................................................... 6

III.     JURISDICTION AND VENUE ........................................................................ 10

IV.     DEFENDANTS' SCHEME ............................................................................... 10

     A.     Background on Defendants' Relationship with the Subdivision Funds ............. 10

     B.     BNY Mellon Was Retained Through a Request for Proposal Process in Which it Made Affirmative Representations About Its Services ...................... 14

     C.     How the Plaintiffs Are Affected by the Banks' Misconduct.............................. 16

     D.     The Banks' Pricing Scheme ................................................................. 19

     E.     How the Bank Prices FX Trades for Custodial Clients....................................... 21

     F.     BNY Mellon's Internal View of the Pricing Scheme......................................... 23

     G.     The Bank Makes Exceptions for Certain Clients, Offering Them Special Pricing................................................................................................ 27

     H.     The Bank Promises But Does Not Deliver "Netting" of FX Trade Requirements.......................................................................................... 28

     I.     The Bank Reaps Illicit Profits From FX Trades For its Custodial Clients.......... 29

         1.     Examples of How Defendants' Fraudulent Foreign Exchange Scheme Works.................................................................................... 29

         2.     How the Bank Manipulates Pension Fund Clients ................................. 29

     J.     A Step-by-Step Analysis of how the Bank Does FX Transactions and Commits Fraud against its Indirect Custody Clients............................................ 33

     K.     Legacy Mellon Transaction Desk Procedures.................................................... 35

     L.     Legacy Bank of New York Procedures ............................................................... 37

     M.     Indirect Trade Example ....................................................................................... 37

COUNT ONE
Substantive Violations of the California False Claims Act
[Presentation of False or Fraudulent Claims for Payment or Approval]................................... 39

COUNT TWO
Substantive Violations of the California False Claims Act [False Records or Statements to Get False or Fraudulent Claims Paid or Approved by the Subdivisions] ......................................... 39

COUNT THREE
Substantive Violations of the California False Claims Act
 [False Records or Statements to Conceal, Avoid, or Decrease an Obligation to Pay
or Transmit Money to the Subdivisions] .................................................................... 40

COUNT FOUR
Substantive Violations of the California False Claims Act [Conspiracy] .................. 40

COUNT FIVE
Unjust Enrichment .................................................................................................... 41

COUNT SIX
Breach of Contract .................................................................................................... 41

COUNT SEVEN
Breach of Fiduciary Duty .......................................................................................... 42

COUNT EIGHT
Fraud by Concealment .............................................................................................. 42

COUNT NINE
Violation of California Bus. & Prof. Code § 17200 .................................................. 43

PRAYER ................................................................................................................... 44

DEMAND FOR JURY TRIAL .................................................................................. 47

Intervening Government entities Los Angeles Water and Power Employees Retirement Plan, Los Angeles County Employees Retirement Association Fund, San Diego County Employees Retirement Association Fund, and Stanislaus County Employees Retirement Association Fund and Plaintiff/Relator ("Relator") FX Analytics, for their Complaint against The Bank of New York Mellon Corporation, its predecessors and subsidiaries ("Defendant(s)," "BNY Mellon," and/or "Bank," and DOES 1 though 100 (including all subsidiaries of the above entities)), allege as follows:

## I.   __INTRODUCTION__

1.      This is an action to recover damages and civil penalties on behalf of Political Subdivisions of the State of California ("State") for harm suffered by the following Political Subdivisions:  the Oakland Police and Fire Retirement System Fund; the City of Los Angeles and the Los Angeles Water and Power Employees' Retirement Plan; Los Angeles County and the Los Angeles County Employees Retirement Association Fund; San Diego County and the San Diego County Employees Retirement Association Fund; Stanislaus County and the Stanislaus County Employees' Retirement Association Fund; Santa Barbara County and the Santa Barbara County Employees Retirement System Fund; Merced County and the Merced County Employees' Retirement System Fund; San Luis Obispo County and the San Luis Obispo County Employees' Retirement Plan; Mendocino County and the Mendocino County Employees Retirement Association Defined Benefit Fund; and Tulare County and the Tulare County Employees Retirement Association Fund (the "Subdivisions" and the "Subdivision Funds," respectively), arising from false claims and statements made and presented by Defendants, their agents, employees and co-conspirators, in violation of the State False Claims Act, Cal Govt. Code § 12651 *et seq.* (the "State False Claims Act" or the "Act").  Intervening Government Entities assert these claims and also assert claims for unjust enrichment, breach of contract, breach of fiduciary duty, fraud by concealment, and violations of California Bus. & Prof. Code § 17200.   The Intervening Government Entities and Subdivision Funds are sometimes referred to herein collectively as "Plaintiffs."

/ / /

2.      Defendants violated the State False Claims Act by misrepresenting rates they would charge for foreign currency exchange ("FX") transactions, assigning fictitious FX rates to the Funds' purchases and sales of foreign securities, making false statements and creating false records related thereto, and conspiring to commit these offenses.  Defendants knowingly and intentionally created and carried out a fraudulent scheme in which they charged the Subdivision Funds fictitious FX rates that were not the FX rates at which Defendants actually executed requested FX transactions for the Subdivision Funds.  This scheme was carried out to conceal, avoid, and decrease an obligation to transmit money to Plaintiffs.

3.      Defendants affirmatively misled the Plaintiffs about their FX practices undertaken on behalf of Plaintiffs, in particular "Standing Instruction" FX transactions. Defendants were aware that if any Plaintiff knew of Defendants' FX practices the practices would have to cease and that Defendants would lose substantial profits.  Internal emails exchanged among high-level executives of Defendants discussed the profits made from this scheme and how these profits would "disappear" if Defendants disclosed their FX pricing practices.

4.      Defendants induced pension funds like Plaintiffs to hire them as their custodial bank by touting their global operations and their state-of-the-art information systems which would permit real-time tracking of account information.  For example, specifically in relation to its FX practices, Defendants said the following in a request for proposal response to LACERA: "All communications with Boston Safe between order taking, execution, operations, and the Institutional Accounting System are seamless.  All of the systems used in the foreign exchange process are real time throughout the day, allowing for a very smooth, uninterrupted communication of information between all parties involved in the foreign exchange process." However, in reality when it came to FX transactions high-level executives of Defendants discussed the need to conceal transaction information from the pension funds because if the pension funds had the ability to "carefully monitor each and every trade at the time of execution" it would "***reduce[] margins dramatically***" and thus harm one of Defendants' "***most profitable form[s] of business***." For these reasons, Defendants endeavored to conceal their true

1    practices while representing to Plaintiffs that they utilized best execution practices on behalf of

2    Plaintiffs.  "Best execution practices" ordinarily requires a broker-dealer to seek the most

3    favorable terms reasonably available under the circumstances for its customers.  Defendants did

4    not do so, and as a result of their scheme and artifice they captured and retained as profit the

5    difference between the actual and the fictitious FX rates, thereby damaging the Subdivision

6    Funds – pension funds with assets in excess of $59 billion dollars.

7              5.       This scheme dates back at least ten years, affects institutional investors

8    nationwide, and has yielded as much as an estimated $500 million dollars annually to the Bank.

9    Relator estimates that the portion of the profits falsely and fraudulently generated from

10   Defendants' business with the Subdivision Funds since at least 1999 is many millions of

11   dollars.  The scheme continued until at least 2010.  After disclosure of a similar FX scheme by

12   State Street Bank, Robert Near, Managing Director and head of Northern American FX sales

13   for Defendants, sent an internal email on July 21, 2010 describing how Defendants were

14   enjoying greater success than competitors in "*maintaining spreads in the FX space*" because,

15   unlike competitors, Defendants were not providing their clients "time stamping" and "fixed

16   spreads" across currencies.  Defendants' failure to provide such information both before and

17   after disclosure of the State Street scheme was a reason why the Plaintiffs were unable to

18   discover the scheme, and violated contractual requirements that Defendants maintain all

19   information concerning transactions taken as custodial bank for the Plaintiffs.

20             6.       An internal document of the Defendants reveals concerns about maintaining the

21   scheme as early as 2008 in response to "*[i]ncreased demands from clients/consultants/other*

22   *interested parties for detailed fee information*."  It was observed that disclosure of the

23   Defendants' scheme could cause Defendants to leave "*mil[lions] or more on the table each*

24   *year*" and that Global Markets clients – like Plaintiffs – would be able to "*further reduce their*

25   *fees from 20 BPS to 1 BPS*."  Commenting on this document, Antonio M. Garcia-Meitin, Jr. of

26   the Asset-Servicing – Global Strategy department of Defendants said "*[i]n general*

27   *transparency adversely impacts our revenue stream and any product to distribute fee*

28

1    *information would hurt us many times over in reduced revenue.  Nothing like a rock and a*

2    *hard place*."

3         7.     Jorge Rodriguez, a Managing Director of Defendants, discussed these issues in a

4    February 1, 2008 email that he titled "the negative impact of e-commerce."  In this email, Mr.

5    Rodriguez said:

6         As we all know, Standing Instruction FX is the most profitable form of

7         business.  It offers the traders a free intra-day option to time its currency

8         execution in the marketplace knowing it does not have to get back to the

9         customer immediately with the deal price.  Business of this type also allows us

10        to take advantage of increased market volatility and wide intra-day trading

11        ranges.  All these pricing advantages disappear when a client trades via an e-

12        commerce platform and full transparency is achieved.

13   In the email, Mr. Rodriguez noted that pressures were growing on the part of Defendants'

14   customers to provide greater transparency, and that this was partly due to the customers' desire

15   to confirm that Defendants were providing "best execution." Mr. Rodriguez concluded his email

16   by observing that – unfortunately for Defendants – a "*fair return is only a fraction of what it*

17   *would be if the business were awarded to BNY Mellon in a non-negotiated capacity*."

18        8.     Defendants concealed their fraud from the Subdivisions in order to keep monies

19   of the Subdivision Funds to which Defendants were not entitled.  Defendants accordingly

20   breached both the Act and their fiduciary and contractual obligations to the Subdivisions.

21        9.     The State False Claims Act provides that any person who knowingly presents, or

22   causes to be presented, to any officer or employee, officer, or agent of the State, or a political

23   subdivision, a false or fraudulent claim for payment or approval is liable for a per-claim civil

24   penalty of up to $10,000 for each such claim submitted or paid, plus three times the amount of

25   the damages, including consequential damages, sustained by the political subdivision.  For

26   purposes of the Act, "knowing" or "knowingly" means that a person possessing actual

27   knowledge of the information acts in deliberate ignorance of the truth or falsity of the

28

1   information or acts in reckless disregard of the truth or falsity of the information, and no proof

2   of specific intent to defraud is required.

3          10.     The Act states that a relator may bring a civil action for violations of the Act on

4   behalf of the relator and the State of California or its political subdivisions.  The complaint shall

5   be filed under seal and shall remain so for 60 days, without service on the Defendants during

6   that period, and cannot be so served without an Order of the Court.

7          11.     Based on the provisions of the Act, Intervening Government Entities and Relator

8   seek to recover compensatory damages, trebled, and civil penalties arising from the Plaintiffs'

9   payment of falsified FX rates in connection with FX transactions on behalf of their public

10  pension funds.  Defendants' conduct has included (a) false or fraudulent claims for payment or

11  approval that the Defendants knowingly presented, and caused to be presented, to officers

12  and/or employees of political subdivisions; and (b) made, used, or caused to be made or used,

13  false or fraudulent to get false or fraudulent claims paid or approved; (c) the Defendants use of

14  false or fraudulent records to conceal, avoid, and decrease the Defendants' obligation to pay

15  money to the political subdivisions in connection with FX transactions on behalf of the

16  Subdivision Funds, and (d) conspiracy to commit these offenses, all in violation of the Act.

17         12.     As described more fully below, the only constraints on the fictitious FX rates

18  charged to the Subdivision Funds have been the high (for purchases) and low (for sales) of each

19  particular day's FX rates as "published" by Defendants.  Defendants' wrongdoing is alleged

20  herewith to have continued to the present, and may continue into the future.

21         13.     It is the regular practice of the Defendants' FX traders and transaction desks,

22  working in conjunction with the Bank's custody department, to leverage every possible FX

23  transaction for the exclusive benefit of the Bank.  Knowing the precise foreign exchange needs

24  of its custody clients, the Bank trades to satisfy its clients' obligations on the interbank market,

25  but then charges a fictitious price to the public pension fund client for the trade.  The fictitious

26  price given to the client allows the Bank to keep a significant illicit profit on the trade.

27         14.     Through this scheme, the Defendants often earn hundreds of thousands of dollars

28  of profit on a single trade.  The Defendants' fraud on their custodial clients, the Subdivision

Funds, occurred – and continues to occur – despite the Bank's contractual and statutory duties, despite the Bank's responsibilities as a fiduciary and the trust it induces the public pension funds to have in the Bank, and despite repeated representations by the Bank as to the benefits of its cutting-edge technology, its advanced claims processing procedures, best execution practices, and the competitiveness of its FX rates.

## II.   PARTIES

15.   The Los Angeles County Employee Retirement Association ("LACERA") is an independent public pension fund created through the County Employees Retirement Law of 1937, Cal. Govt. Code §§ 31450 *et seq.* which promises retirement benefits to eligible county employees and mandates LACERA to administer them.  LACERA is entrusted to produce, protect, and provide the promised benefits of more than 150,000 individuals who spend their careers contributing to the greater welfare of Los Angeles County.  In 1994, LACERA entered into an agreement for custodial services with Boston Safe Deposit and Trust Company of California ("Boston Safe"), a predecessor of Defendants for which Defendants are responsible (the "Contract").  LACERA's power to enter into this agreement was derived from Article XVI, Section 17 of the California Constitution and Cal. Govt. Code § 31596(b).   The Contract provided, *inter alia*:

> a.   That the Bank's response to LACERA's Request for Proposal to provide domestic and global custody services described the custody and related services that the bank offered to provide to LACERA and the general terms under which such services would be provided.

> b.   Defined "Custodian" as the Bank "in its fiduciary capacity as the entity which is obligated to preserve, control, and safekeep any Property deposited or otherwise entrusted to it for LACERA."

> c.   Defined "Standard of Care" as the "standard governing Bank's and its Agents' performance under this Agreement and shall have the meaning set forth in Section 5 below."  Section 5 states:

/ / /

<u>Standard of Care</u>.  Bank acknowledges that this Agreement places it in a fiduciary relationship with LACERA.  As such, Bank shall discharge each of its duties and exercise each of its powers under this agreement with the competence, care, skill, prudence, and diligence prevailing in the custodial industry and which a prudent person acting in a like capacity and familiar with such matters would use in the conduct of a like enterprise with like aims ("Standard of Care"). Bank shall cause any and all of its Agents to exercise the same Standard of Care.

d.      Provided the following record-keeping requirements:

<u>Record Retention and Inspection</u>.  Bank and its Agents shall keep and maintain all records related to LACERA, including but not limited to any pertinent transaction, activity, time sheets, cost, billing, accounting and financial records, proprietary data, telephonic recordings, and any other records created in connection with this Agreement ("LACERA Records"), according to Bank's record retention standards. Bank agrees to immediately notify LACERA of any change in such standards. Bank shall keep and maintain LACERA Records according to Bank's record retention schedule for no less than five (5) years following the termination of this Agreement.

16.      The Los Angeles Department of Water & Power Retirement Plan ("LADWPRP") was created in 1938 by the Los Angeles Department of Water & Power ("LADWP").  LADWP is the nation's largest municipal utility, serving the water and electricity needs of the City of Los Angeles.  LADWPRP is designed to promote financial security and help for employees of the Los Angeles Department of Water & Power and to help them prepare for their future through comprehensive programs that provide income at retirement and during disability; death benefits for beneficiaries; and continuation of benefits for eligible survivors. In 2004, LADWPRP entered into a custodial agreement with Defendants.  This agreement included many of the same contractual terms as in the LACERA agreement, including that the

Defendants would act as a fiduciary in relation to its obligations to LADWPRP under the contract.  The agreement states: "The Custodian acknowledges that it is a Plan fiduciary with respect to the duties undertaken pursuant to this Agreement.  The Custodian shall perform its duties under this Agreement with the care, skill, produce, and diligence under the circumstances then prevailing that a prudent expert acting in like capacity and familiar with such matters would use in like situations."

17.    The San Diego County Employees Retirement Association ("SDCERA") was created through the County Employees Retirement Law of 1937, which promises retirement benefits to eligible county employees and mandates SDCERA to administer them.  SDCERA administers retirement and associated benefits for eligible employees of the County of San Diego.  In 2005, SDCERA entered into a contract with Mellon Trust of California to provide custodial services.  Mellon Trust of California is a predecessor of Defendants for which Defendants are responsible.  This contract included many of the same terms as in the LACERA agreement.  Among other provisions, this contract provided that Mellon Trust, in performing its duties, would "exercise the same care and diligence that a professional custodian engaged in the banking or trust company industry and having professional expertise in financial and securities processing transactions and custody would observe in these affairs."

18.    The Stanislaus County Employee Retirement Association ("StanCERA") was created through the County Employees Retirement Law of 1937, which promises retirement benefits to eligible county employees and mandates StanCERA to administer them.   StanCERA administers the retirement benefits for employees of Stanislaus County, the City of Ceres, the Superior Court of the State of California, County of Stanislaus, and five special districts located within Stanislaus County.  In 2003, StanCERA entered into an agreement with BNY Western Trust Company to provide custodial services.  This agreement includes many of the same terms as the agreements identified above.

19.    Relator, a Delaware general partnership, is named FX Analytics and brings this action for violations of The State False Claims Act, on behalf of itself and the Political Subdivisions named herein other than the Intervening Government entities.  The owner of the

partnership (the "Partner") possesses extensive knowledge and experience regarding the Defendants' bank offices, businesses and personnel, including personal contact with the employees and executives of BNY Mellon (Defendant(s)) who have committed the alleged violations of the Act, as described below.  The Partner possesses personal knowledge to support and establish the charges asserted in this Complaint.

20.     Pursuant to Section 15-201(a) of the Delaware Revised Uniform Partnership Act, FX Analytics is not distinct from its partner, who has personal knowledge of the aforesaid false claims, statements, concealments, and receipts.

21.     Defendant, The Bank of New York Mellon Corporation ("BNY Mellon"), is the parent corporation resulting from the July 1, 2007 merger of the Bank of New York Company, Inc. and Mellon Financial Corporation.  By July 1, 2008, the Bank had consolidated into two banks and renamed its principal bank and trust companies The Bank of New York Mellon, N.A. and BNY Mellon, National Association.  These entities, along with many others, are primary subsidiaries of the parent corporation, The Bank of New York Corporation.  BNY Mellon assumes the liabilities of the corporations merged into it.  NY CLS Bank § 602(2).  As referred to herein, therefore, general references to "BNY Mellon" include the merged corporation as well as its constituent, individual predecessor corporations and subsidiaries – unless otherwise noted.

22.     Bank of New York Mellon Trust Company, N.A., which was known prior to July 1, 2008 as The Bank of New York Trust Company, National Association, is a national bank headquartered at 700 South Flower Street, Suite 200, Los Angeles, California, 90017. BNY Mellon describes Bank of New York Mellon Trust Company, N.A. as a "primary subsidiary" of BNY Mellon.  When the term "Defendants" is used herein, it includes Bank of New York Mellon Trust Company, N.A. as well as BNY Mellon as described above.

23.     BNY Mellon's corporate headquarters are located at One Wall Street, New York, New York, 10286.  Its symbol on the New York Stock Exchange is "BK."  According to its website, as of the second quarter of 2009, BNY Mellon maintained $20.7 trillion under custody and administration, with $926 billion under management.

24.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 100 are unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names, and will amend this Complaint to show the true names and capacities of the DOE defendants when ascertained.  Relator alleges on information and belief that each Defendant designated as a "DOE" is legally responsible in some manner for the events and happenings alleged in this Complaint.

### III.     JURISDICTION AND VENUE

25.     This action was originally filed in the Superior Court of the State of California, County of Oakland.  On November 28, 2011, Defendant removed this action to the United States District Court for the Northern District of California on the basis of diversity jurisdiction.

26.     Venue is proper in this District because one or more Defendants can be found in, reside in, and/or transact business in this county, and because some of the violations of Cal. Govt. Code §§ 12650-12655 described herein occurred within this District.  Specifically, Defendant BNY Mellon has transacted business in this District by providing custodial banking services and FX Services to the Oakland Police and Fire Retirement System Fund, and has perpetrated the fraudulent scheme described herein in the course of providing these services. In addition, Plaintiff Oakland Police and Fire Retirement System Fund is located in this District.

### IV.     DEFENDANTS' SCHEME

#### A.     Background on Defendants' Relationship with the Subdivision Funds

27.     BNY Mellon's main business lines include Asset Management, Asset Servicing, Wealth Management, Broker-Dealer & Advisor Services, Issuer Services, and Treasury Services.  BNY Mellon Asset Servicing is responsible for the custodial banking at issue in this Complaint, and the fraudulent FX fees earned through Defendants' scheme are reported as Asset Servicing income.

28.     BNY Mellon serves as the custodian bank for a large number of state and local government funds across the country. According to the Bank's 2008 Annual Report, it is "the largest custodian for U.S. public pension plans."

///

29.     In 2010, BNY Mellon reported $887,000,000 in foreign exchange and other trading activity revenue, which followed FX revenue totals of $1,000,000,000 in 2009 and $1,462,000,000 in 2008.  For the years 2000 to 2010, BNY Mellon and its predecessors have reported more than $7.7 Billion in foreign exchange trading revenue.  The great majority of these profits came directly at the expense of custodial clients like the Plaintiffs as a result of the scheme alleged herein.  Approximately 70% of the bank's FX trading revenue is directly attributable to standing instruction trades.

30.     BNY Mellon made public and private misrepresentations of its foreign exchange practices in order to induce public pension funds to become its clients.  It contended that its foreign exchange and custodial services were successful, award-winning, and skillful.  Its website misleadingly explained the various foreign exchange services that it offered to custodial clients like the Plaintiffs.  One mode of execution, known as "Standing Instruction," was the manner of execution that the Bank induced the Subdivision Funds, and public pension funds generally, to select.  This trading method – also known as "Indirect" within the industry and described further herein – funneled all of the Funds' FX transactions to BNY Mellon for execution.

31.     The Subdivisions chose BNY Mellon's "Standing Instruction" mode of execution of FX transactions because BNY Mellon misleadingly marketed it to the Subdivisions and Subdivision Funds as a cost-saving benefit.  During the time period relevant to this action, BNY Mellon's website was replete with misrepresentations concerning the Bank's FX services, which the Plaintiffs allege to be untrue and instrumental to the scheme alleged herein:

> i.     "With 24-hour trading capability via New York, Boston, Pittsburgh, London, Brussels, Tokyo, Hong Kong, Seoul, and Tapei, The Bank of New York Mellon is one of the largest FX dealers in the world.  We provide coverage for more than 100 currencies and offer a myriad of FX derivative products.  Our seasoned dealers offer innovative business solutions . . ."

> ii.    "The Bank of New York Mellon Global Markets is a recognized leader in the institutional and corporate global foreign exchange

markets.  Our foreign exchange specialists are able to provide expert analysis and advice accompanied by a full range of products to support your global business activity."

          iii.    "Execution: Our global franchise provides you with 24 hour market coverage.  Due to our standing as one of the world's leading custodial Banks, we are an active market-maker in the spot, forward and option markets."

          iv.    "Standing Instruction [Indirect Foreign Exchange] trading provide[s] a simple, flexible, and complete service solution that automates the capture of all types of custody-related foreign exchange . . . Operationally simple, ***free of charge*** and integrated with the client's activity on the various securities markets, [Foreign Exchange] standing instruction is designed to help clients minimize risks and costs related to the foreign exchange and concentrate on their core business."

          v.    "Standing Instruction Foreign Exchange Clients benefit from: [foreign exchange] execution according to ***best execution standards*** . . ." (Emphases added).

32.    To maintain the enormous illicit profits that BNY Mellon makes from its Indirect FX custodial clients, including the Plaintiffs and other similarly positioned public pension funds, the Bank touts the strength of its relationship with those same pensions it defrauds – largely public pension funds:

          i.    A Leading Provider For Government Entities: Public pension plans and other government agencies seek to align themselves with a custodian who is a clear leader, one who has the capabilities and experience to help them meet the numerous challenges facing their organizations today including: Increased regulatory oversight, complex global investing environment, pressure to grow assets while managing with existing or decreasing resources, and corporate governance.

1             ii.      BNY Mellon Asset Servicing understands the

2      unique needs of public organizations and has worked with their decision-makers

3      to professionally administer their assets.

4      33.     Until October of 2009, BNY Mellon described standing instruction custodial FX

5 trades as being "free of charge" to custodial clients; such misrepresentations include, but are not

6 limited to, publications such as its websites.  BNY Mellon changed this description after similar

7 practices by State Street Bank became public.  BNY Mellon knew its standing instruction FX

8 service was not free of charge, however.  BNY Mellon's pricing scheme enabled it to earn

9 substantial and yet undisclosed fees based on the spreads between the worst prices provided to

10 custodial clients and the better prices that BNY Mellon obtained for itself.

11      34.     Until October of 2009, BNY Mellon described standing instruction custodial FX

12 trades as being subject to "best execution" standards; until November or December of 2009, the

13 Bank defined "best execution" as "quantitative proof that an agent or trader obtained the best

14 available price in the market."  Such misrepresentations include, but are not limited to,

15 publications such as its websites.   BNY Mellon was aware that its custodial clients sought FX

16 execution pursuant to these standards.  Indeed, BNY Mellon was aware that custodial clients,

17 mindful of their obligations to their beneficiaries, were seeking out the custodial bank that

18 would insure that they satisfied these obligations.  BNY Mellon made these representations in

19 order to mislead the custodial clients into believing that it would offer the best practices

20 available under the circumstances.

21      35.     BNY Mellon's representations had and have little or nothing to do with its actual

22 practices toward the affected custodial clients such as Plaintiffs.  These representations were

23 false and fraudulent and made with the intent that Plaintiffs rely on them in approving the false

24 FX rates and prices assigned to their trades.

25      36.     FX prices at the extremes of the range of the day are not competitive.  Moreover,

26 the custodial standing instruction range of the day prices charged to Plaintiffs were designed to

27 bring the most possible revenue to BNY Mellon.  Such a pricing scheme could never provide

28 competitive prices to Plaintiffs and BNY Mellon's statement to the contrary was false.

Moreover, BNY Mellon never reported, disclosed or informed the Plaintiffs of the fact and size of its self-payments.

**B.**     **BNY Mellon Was Retained Through a Request for Proposal Process in Which it Made Affirmative Representations About Its Services**

37.     The Plaintiffs retained Defendants as custodian banks through a request for proposal ("RFP") process.  During the RFP process, Defendants made representations to the Plaintiffs such as the following representations made to the Los Angeles Department of Water & Power Retirement Plan:

a.      "As custodian of your assets, [we have] a fiduciary responsibility to ensure that all of your assets are properly held in safekeeping and that all assets are accurately reported on our accounting system."

b.      It was "able to settle trades, handle cash, provide foreign exchange services, provide tax reclamation services, price securities, and is able to accommodate ***all*** essential custodial services in the foreign markets in which [LADWPRP] is invested."

c.      Its "Institutional Accounting and reporting system (IAS) will accurately account for all securities, regardless of asset class, cash, receivables and payables, futures, options, swaps, forwards, and other non-traditional securities, in both base and local currency."

d.      In relation to foreign exchange capabilities, "[it] operates full service trading rooms in London, Boston, and Pittsburgh providing 24-hour market access for our clients.  We have an extensive Foreign Exchange Division, consisting of 66 people.  We provide investment managers of our clients with access to one of the most competitive and efficient foreign exchange operations in the industry.  [It's] Foreign Exchange Division strives to provide extremely competitive market drive rates, while ensuring an accurate and efficient settlement process. The competitiveness of its rates is

1    ensured through a range discrepancy report that the Manager of the Foreign

2    Exchange Division receives daily.  This report displays an foreign exchange

3    rate that falls outside of the daily range provided by Reuters.  This report

4    allows senior management to review the foreign exchange rate process and to

5    verify that Mellon is providing market competitive rates to our institutional

6    clients."

7        38.    During the RFP process between Boston Safe and LACERA, Boston Safe made

8    the following representations about itself and its services:

9            a.    We have been in the trust business – in the fullest sense

10    of the word – for more than 100 years.  Our combined success is based on a

11    twofold commitment: to innovation on the one hand, and the traditional values

12    of integrity and conservative business practice on the other.

13            b.    In relation to providing competitive rates for foreign

14    exchange transactions, Defendants said:

15    **Competitive Rates**

16        Boston Safe's Foreign Exchange Division strives to provide extremely

17        competitive market driven rates, while ensuring an accurate and efficient

18        settlement process. The competitiveness of Boston Safe's rates is

19        ensured through a range discrepancy report that the Manager of the

20        Foreign Exchange Division receives daily. This report displays any

21        foreign exchange rate that falls outside of the daily range provided by

22        Reuters. This report allows senior management to review the foreign

23        exchange rate process and to verify that Boston Safe is providing market

24        competitive rates to our institutional clients. Approximately 80% of the

25        division's volume relates to master trust/custody client activity.

26        39.    Similar representations were made to Plaintiffs in their RFP processes and

27    marketing materials, including Defendants' website, as set forth above.

28    / / /

**C.**     **How the Plaintiffs Are Affected by the Banks' Misconduct**

40.     Substantial governmental appropriations to the Plaintiffs are required by statute and these appropriations have been made during the course of BNY Mellon's custodianship of the funds.

41.     When funds are wrongly withheld or misappropriated through misconduct perpetrated against Plaintiffs, additional government funds must be paid to Plaintiffs, which monies otherwise could have been made available for essential services to citizens.

42.     In addition, each dollar of revenue generated by the bank's extreme range of the day pricing is a dollar that comes directly from the Plaintiffs, resulting in direct losses to the Plaintiffs.

43.     Over the period of time relevant to this Complaint, Plaintiffs have paid BNY Mellon substantial sums to provide custodial services.  The bank has charged and collected these fees despite failing to provide the required services.

44.     Moreover, the investment losses due to BNY Mellon's FX pricing scheme are magnified due to the absence of compounded investment returns.

45.     As such, each FX trade loss caused by BNY Mellon will be magnified because each loss is money and/or property of the Plaintiffs that was lost and thus will not increase in value over time.

46.     BNY Mellon presented End of Month Client Custody Reports listing the pension fund's FX currency trades, disguising the marked-up or marked-down FX trades, and distributed such reports to the Plaintiffs.  This information was knowingly omitted from the monthly reports presenting standing instruction FX trades to the Plaintiffs for approval.  Both the FX rates and prices on the monthly reports and the monthly reports themselves were false and violative of the bank's contractual and fiduciary obligations.

47.     As custodian and fiduciary of the public pension funds of the Plaintiffs, BNY Mellon had access to certain property of the Plaintiffs, including cash.

/ / /

48.     The cash property that BNY Mellon was entrusted to keep and safeguard includes, but is not limited to, the cash in certain accounts of the Plaintiffs known as cash accounts.

49.     At all times relevant to this Complaint, BNY Mellon and/or one or more agents under its control, were entrusted with access to and control of those cash accounts, including the ability to debit and credit those cash accounts in its capacity as the Plaintiffs' custodian bank.

50.     Pursuant to the custodial agreement, as well as by operation of law, BNY Mellon was to collect all money due and owing to the Plaintiffs arising out of its FX activities on behalf of the Plaintiffs.

51.     Also pursuant to the custodial agreement, as well as by operation of law, BNY Mellon was to pay all debits incurred on behalf of the Plaintiffs as part of its FX activities on behalf of the Plaintiffs.

52.     Such credits, when collected by BNY Mellon, would be deposited into the cash accounts of the Plaintiffs that the bank was entrusted to hold as the master custodian.

53.     Such debits, when made by BNY Mellon, were to be made from the cash accounts of the Plaintiffs that it was entrusted to hold.

54.     In the cases of credits or debits arising as a result of FX trades executed by BNY Mellon, the bank debited more than the Plaintiffs should have paid for purchases of FX and credited less than the Plaintiffs should have received for sales of FX.

55.     BNY Mellon's misconduct, including the process of making a mark-up or mark-down on the Plaintiffs' FX standing instruction trades, extended to each, and every, such FX transaction conducted by it as master custodian for the Plaintiffs over the period of time relevant to this Complaint.

56.     BNY Mellon's misconduct on these FX transactions damaged the Plaintiffs. Altogether, Plaintiffs hold more than $59 billion in assets.  A significant percentage of the Plaintiffs assets include international securities that necessitate FX transactions.  Approximately 21% of the Los Angeles County Employees Retirement Association Fund is allocated to international equities and investments. Approximately 27% of the San Diego County

Employees Retirement Association Fund is allocated to international equities and investments. Approximately 15% of the Los Angeles Water and Power Employees Retirement Plan Fund is allocated to international equities and investments. Approximately 18% of the Santa Barbara County Employees Retirement System Fund is allocated to international equities and investments. Approximately 19.8% of the Stanislaus County Employees Retirement Association Fund is allocated to international equities and investments. Approximately 15% of the Oakland Police and Fire Retirement System Fund is allocated to international equities and investments. Approximately 19% of the Tulare County Employees Retirement Association Fund is allocated to international equities and investments. Finally, approximately 19% of the Mendocino County Employees Retirement Association Fund is allocated to international equities and investments. Combined, at present, approximately $12,486,785,000 of Plaintiffs' money is subject, daily, to Defendants' fraud.

57.     Defendants have served as, or are, the custodial bank for the Plaintiffs enumerated herein.

58.     The Plaintiffs' custodial agreements with Defendants do not authorize the FX rates charged by Defendants in connection with the FX transactions described herein.  The Subdivision Funds have never approved the retention by the Defendants of the difference between their actual FX cost and the fictitious FX rates falsely charged by Defendants and passed on to the Subdivision Funds.

59.     The Plaintiffs never agreed that their master custodial agreements with BNY Mellon entitled Defendants to any earnings above those specified in those agreements. Nonetheless, Defendants secretly conferred upon themselves the discretion to charge the Plaintiffs fictitious FX rates and to pocket the difference from the FX rates that were actually paid by Defendants in connection with purchases and sales of foreign currencies for the Subdivision Funds.

60.     Over the period of time relevant to this Complaint, the Plaintiffs have paid millions of dollars in custodial fees to Defendants.  Moreover, through its standing instruction scheme, the Bank has effortlessly generated millions of dollars in risk-free revenue while the

1    Plaintiffs have struggled to meet funding requirements in the face of major losses in value

2    attributable to the economic downturn of the last eighteen months.  Indeed, the money lost due

3    to BNY Mellon's fraudulent FX scheme is money that will not earn compounded investment

4    returns for the Plaintiffs' funds over the thirty-plus year time horizon that applies to most

5    pension plans, and each such loss will triple each decade.

6         61.    As master custodian, BNY Mellon purchased and sold large amounts of foreign

7    currency for Plaintiffs through standing instruction trades.  BNY Mellon added hidden spreads,

8    including mark-ups and mark-downs, to these foreign exchange trades rather than pricing the

9    trades at the exchange rates at which it actually executed the transactions, causing the Plaintiffs

10   to pay far more than they should have for buys and receive much less than it should have for

11   sells.  BNY Mellon also caused greatly increased (and unnecessary) trading costs for the

12   Plaintiffs by not netting foreign exchange transactions when the Plaintiffs bought and sold the

13   same currency on a given day.  Due to BNY Mellon's misconduct, the government will

14   ultimately have to provide additional funding to the Plaintiffs, monies that otherwise could have

15   been made available for essential services to their citizens.

16        **D.    The Banks' Pricing Scheme**

17        62.    The value of a foreign currency relative to the United States Dollar or to another

18   foreign currency is known as the "exchange rate."  Exchange rates for currencies fluctuate

19   throughout the day.  It is possible for a given foreign currency to lose value during the day; it is

20   also possible for a given foreign currency to gain value during the day.  BNY Mellon

21   knowingly and intentionally charged the Plaintiffs incorrect exchange rates for purchases and

22   sales of foreign currency.  BNY Mellon added hidden spreads, including mark-ups and mark-

23   downs, to the Plaintiffs' foreign exchange trades and presented for approval through its monthly

24   reports inflated or deflated rates to the Plaintiffs, rather than the exchange rates at which it

25   actually executed the transactions.

26        63.    By marking up (for buys) or marking down (for sells) the prices paid by the

27   Plaintiffs, BNY Mellon caused the Plaintiffs to pay more than they should have for buys and

28   receive less than they should have for sells.

64.     In order to keep the truth from the Plaintiffs, BNY Mellon presented for approval through its periodic accountings and monthly reports foreign exchange prices that failed to reflect the actual cost of the transactions and which concealed the fact and size of its mark-ups or mark-downs.

65.     BNY Mellon developed this scheme because whenever the bank purchased a foreign currency at an exchange rate, and then charged the Plaintiffs for that currency at a less favorable exchange rate, it made a tremendous profit at the expense of the Plaintiffs.  This profit was knowingly omitted from the monthly reports presenting standing instruction FX trades to the Plaintiffs for approval.

66.     Over the period of time relevant to this Complaint, BNY Mellon knowingly used false pricing and false and fraudulent statements —including the monthly reports — in order to profit from, and keep, the Plaintiffs' monies.  These reports — omitting the fact and size of spreads taken by BNY Mellon in contravention of its contractual and fiduciary duties to the Plaintiffs — were created by BNY Mellon to get the Plaintiffs to approve the bank's false claims.

67.     At all such times, BNY Mellon kept these profits a secret from the Plaintiffs.

68.     At all such times, BNY Mellon failed to report the fact, size or amount of the hidden spreads, mark-ups, and mark-downs paid to it by the Plaintiffs, in avoidance of its contractual and/or fiduciary obligations to do so.

69.     BNY Mellon captured and kept the difference between the actual and false (marked-up or marked-down, depending on whether the transaction was a 'buy' or 'sell') exchange rates, its actions resulting in a loss to the Plaintiffs and in damages to the Plaintiffs.

70.     It is the regular practice of BNY Mellon to manipulate foreign exchange rates and transactions for its exclusive benefit and financial gain.

71.     The foreign exchange trades affected by BNY Mellon's actions described herein were known as "standing instruction" and/or "non-negotiated" trades.  Affected trades include all such foreign exchange trades executed by BNY Mellon while custodian for the Plaintiffs,

1    including spot, forward, swaps, repatriation, and major, minor, emerging, and regulated market

2    trades.

3         **E.        How the Bank Prices FX Trades for Custodial Clients**

4         72.     By employing the pricing scheme described herein, BNY Mellon almost always

5    profits from and almost never suffers a loss on the Plaintiffs' standing instruction and non-

6    negotiated trades.

7         73.     BNY Mellon's foreign exchange traders are informed of the bank's aggregated

8    standing instruction trade requirements during the course of the day.  The FX traders will, that

9    day, trade on the interbank FX market in order to satisfy the bank's standing instruction

10   positions.  This process is called "offsetting" the trades.

11        74.     Through an internal, "intra-desk" trade, the trader next "trades" the FX (every

12   FX transaction combines a "buy" and a "sell") to the FX department's Transaction Desk.  The

13   Transaction Desk is then responsible for pricing, *i.e.*, adding the bank's hidden "mark-up" to or

14   subtracting the bank's hidden "mark-down" from the price the bank's FX trader paid on the

15   interbank market.

16        75.     At all times relevant to this Complaint, the pricing of FX trades for the Plaintiffs

17   has been done by the bank's Transaction Desk.  When the Plaintiffs paid BNY Mellon for their

18   standing instruction FX trades, the Plaintiffs paid a price determined by the bank's Transaction

19   Desk.

20        76.     In order to price the Plaintiffs' standing instruction trades, the Transaction Desk

21   looks to the "range of the day" of the relevant exchange rate.  At any given time, each day, each

22   tradable currency pair will have had a high exchange rate and a low exchange rate, as the

23   relative strengths of the two currencies change.

24        77.     The range of the day is important to the Transaction Desk because that range,

25   which can vary by hundreds of basis points each day, sets the high and low prices to charge the

26   Plaintiffs for their FX trades, regardless of the price paid for the currency by BNY Mellon's FX

27   trader.  (100 basis points equals 1%; a 100 basis point "spread" on a $10 million trade would

28   result in revenue of $100,000.)

78.     Thus, if a Plaintiff's standing instruction FX transaction involved the purchase of Euros, the Transaction Desk would set that Plaintiff's price at the highest price of the day for the Euros, causing the Plaintiff to pay the highest possible price within that day's trading range for that amount of Euros.  This process is followed regardless of where BNY Mellon's FX trader actually offset the Euros on the interbank market.

79.     Conversely, if a Plaintiff's standing instruction FX transaction involved the sale of U.S. Dollars, the Transaction Desk would set the Plaintiff's price at the lowest price of the day for the Dollars, causing the Plaintiff to receive the lowest possible price within that day's trading range for that amount of Dollars.  Again, this is done without regard to the price that BNY Mellon actually paid.

80.     BNY Mellon maximizes, and has maximized, its FX profits on all standing instruction and non-negotiated FX trades undertaken as the custodian bank for the Plaintiff during all times at issue in this Complaint.

81.     With each FX trade priced by the bank's Transaction Desk in this manner, BNY Mellon does not simply profit; it makes the biggest possible profit on each trade, based upon the range of the day's FX rates at the point the trade is priced for a Plaintiff.

82.     Custodial clients trading under BNY Mellon's standing instruction FX system who suffered pricing at the end of the day's range were referred to as "range of the day" clients.

83.     Because BNY Mellon always prices the trades at the very lowest or very highest rates of the day, the bank's FX traders are almost always able to obtain the needed foreign currency at a better price, enabling BNY Mellon to make a profit without any risk to the bank.

84.     The Transaction Desk does not consult with or contact the Plaintiffs in any way prior to pricing the Plaintiffs' trades with a mark-up or mark-down.  The Plaintiffs are never informed of the size of the Transaction Desk's mark-ups and mark-downs.  The first time the Plaintiffs learn of the price for the FX transaction is after they have paid for the trade, when monthly reports omitting the actual prices paid by BNY Mellon for the foreign exchange are presented for approval.

85.     By pricing trades based upon the range of the day for its standing instruction trades, BNY Mellon secures a spread ten to twenty or more times greater than when a custodial client directly negotiates an FX transaction.  That is, BNY Mellon's profits arising from its custodial standing instruction trades are at least ten to twenty times more profitable than its profits from comparable arm's length FX transactions.

### F.    BNY Mellon's Internal View of the Pricing Scheme

86.     BNY Mellon's internal email communications show that the bank promoted a lack of transparency surrounding its standing instruction FX practices and intended that custodial clients rely upon the monthly reports and statements that were created by for the purpose of preventing transparency.

87.     One email, dated February 8, 2008, from Jorge Rodriguez, BNYM's Executive Vice President of Global Sales and a Managing Director at the Bank's New York City offices, explained to a number of other high-ranking BNYM executives, including Richard Mahoney, Executive Vice President of Global Markets, that the "*pricing advantages*," of BNY Mellon's FX pricing scheme would "*disappear*" if the Bank's custodial clients achieved "*full transparency*."

88.     Mr. Rodriguez continued, noting that "*standing instruction FX is the most profitable form of business*."  If "*full transparency*" were provided to custodial clients, it would negatively impact bank income because transparency would "*reduce margins dramatically*."

89.     BNY Mellon executives were acutely concerned with the profits that would disappear if the bank's standing instruction FX practices became transparent.  In an email and attachment dated April 11, 2008, bank executives enumerated the specific effects of fee disclosure to clients.  "*In general transparency adversely impacts our revenue stream and any product to distribute fee information would hurt us many times over in reduced revenue. Nothing like a rock and a hard place*."

90.     The same communication attached a list of "Top 5 impacts" of disclosing revenue and fee information to clients.  The bank noted that fee disclosure impacts were

1  necessary because of "increased demands from clients/consultants/other interested parties for

2  detailed fee information."  Moreover, the bank noted that "our clients and their representatives

3  are becoming more sophisticated in understanding how we generate revenue from their

4  accounts."

5        91.    BNY Mellon considered disclosure of its standing instruction as something that

6  would allow the bank's clients to reduce their fees to approximately 5% (from a cost of 20 basis

7  points to 1 basis point) of their current costs under the standing instruction pricing scheme.

8  Although the bank listed various "Recommended Actions" in response to these concerns, none

9  of those options included either making its processes transparent or disclosing its practices,

10  including the fact and size of a mark-up or mark-down, to its clients.

11        92.    Another email written by Jorge Rodriguez from February 1, 2008 also

12  recognizes that standing instruction FX is the "***most profitable***" business for BNY Mellon.  The

13  reason that standing instruction FX trading was profitable for the bank was because of a ***lack of***

14  "***full transparency***."  The FX trading scheme utilized a "free intra-day option to time currency

15  execution" that was never disclosed to clients.

16        93.    Mr. Rodriguez also noted that the bank was forced to reconsider its standing

17  instruction FX practices because custodial clients were "***getting pressure from their internal***

18  ***and/or external regulators to demonstrate best execution***."

19        94.    In arguing for a "fair return" on FX business for the bank, Mr. Rodriguez also

20  admits that a "***fair return" on negotiated deals "is only a fraction of what it could be if the***

21  ***business where (sic) awarded to BNY Mellon in a non-negotiated capacity***."

22        95.    The recognition that BNY Mellon's standing instruction FX trading harmed

23  custodial clients was described by David Nichols, a BNY Mellon Managing Director of Global

24  Markets, on August 1, 2006, when he admitted that the bank always profited on standing

25  instruction FX trades.  "***We charge a premium for our services (i.e., we have the audacity to***

26  ***think we are entitled to a spread on every trade.  How 1990's is that?)***"

27        96.    Regardless of BNY Mellon's belief that it was "entitled" to a spread on every

28  trade, the bank was able to secure those spreads because of its knowing failure to disclose its

practices to custodial clients, its affirmative misrepresentations, and a failure of the contractual and fiduciary duties that it owed to the Plaintiffs.  BNY Mellon's standing instruction FX trading revenue was not earned because of its skill or market knowledge.

97.     BNY Mellon failed to disclose its standing instruction pricing practices, including the fact and size of its mark-ups and mark-downs, or the price the bank actually paid for the currency, each time it reported FX trades to the Plaintiffs.  The FX trade information constituted claims to the state for payment or approval that were made false because of the bank's omissions and false conduct.

98.     BNY Mellon knowingly failed to make relevant disclosures of these material facts — and made affirmative representations to the contrary — because the bank wanted to protect its unreported FX profits and revenue.  One bank executive wrote an email in 2009 arguing against transparency specifically because it would put the bank's FX revenue at risk: "*I do NOT like it.  Once pricing spreads are disclosed it will be a race to how quickly clients can work it down to zero.*"

99.     BNY Mellon's practice of pricing FX trades for custodial standing instruction clients is a long-standing practice and done with the knowledge of bank staff and management. Prior to their merger, both Bank of New York and Mellon Bank priced FX trades for custodial standing instruction clients utilizing this pricing methodology.

100.     BNY Mellon is aware that FX trades priced according to the range of the day are riskless transactions.

101.     BNY Mellon's practice of pricing trades according to the range of the day and taking the largest possible mark-up or mark-down is not, and has never been, disclosed to custodial clients like the Plaintiffs over the period of time relevant to this Complaint.

102.     BNY Mellon further exacerbates the Plaintiffs' injuries resulting from the range of the day pricing by willfully and knowingly waiting to price trades when the range of the day is still changing in the bank's favor.  Thus, although the Transaction Desk generally prices trades around 1:30 p.m. EST, based upon the range in existence at that point, if the range is still

1   changing in the bank's favor, the Transaction Desk will wait to price its custodial standing

2   instruction trades, allowing BNY Mellon to make an even greater, illicit profit.

3       103.    BNY Mellon's practice of waiting to price trades so that the range of the day can

4   change in its favor is not, and has never been, disclosed to custodial clients like the Plaintiffs

5   during the period of time relevant to this Complaint.

6       104.    All BNY Mellon custodial clients who had standing instruction trades (including

7   spot, forward, swaps, repatriation, and major, minor, emerging, and regulated market trades)

8   priced through the bank's Transaction Desk suffered from the same fraudulent FX pricing.

9       105.    BNY Mellon's FX pricing scheme extended to each currency it traded for any of

10   its custodial clients.  That is, the Transaction Desk priced all custodial clients at the high or low

11   of the range of the day for every foreign currency traded through standing instructions.

12       106.    When the Transaction Desk priced the standing instruction trades, each custodial

13   client, including the Plaintiffs, received the same price for that particular currency that day.  As

14   noted, the Transaction Desk prices for all currencies were always based upon the high and low

15   of the range of the day's rates.  These prices were always multiples greater than comparable

16   arm's length FX transactions that BNY Mellon completed through direct (non-standing

17   instruction) trades.

18       107.    At the conclusion of each trading day, a "Reconciliation" call between BNY

19   Mellon's New York and Pittsburgh Transaction Desks is made.  The Pittsburgh Transaction

20   Desk will call the New York Transaction Desk so that they can synchronize their high and low

21   ranges for each currency pair (these telephone calls are made on a private, direct line and may

22   have been shielded from the Bank's customary policy of recording transactional conversations).

23       108.    This call, done at approximately 2:30 p.m., is made so that any discrepancies

24   between each Transaction Desk's prices are avoided and discovery or evidence of BNY

25   Mellon's pricing scheme is thus made less likely for any custodial clients whose trades go

26   through both the New York and Pittsburgh desks in the same day.

27       109.    When "legacy Mellon" custodial clients called the bank seeking information

28   about standing instruction pricing on particular trades, they were connected to the FX

1    department's transaction desk in Pittsburgh.  The bank employees working the transaction desk

2    would never disclose the bank's actual trading and pricing practices in response to these

3    questions, i.e., that the bank priced standing instruction trades at the extremes of the range of

4    the day so that the bank profited and the client was harmed.

5    **G.**    **The Bank Makes Exceptions for Certain Clients, Offering Them Special**
         **Pricing**
6

7    110.    Over time, BNY Mellon has developed a special class of custodial clients that do

8    not receive the high or low range of the day pricing suffered by other custodial clients, like

9    Plaintiffs.  These clients, known internally as "opt out" clients, still receive the same standing

10   instruction custodial services as the other entities like Plaintiffs, but receive particular treatment

11   when their FX requirements come to the bank's FX dealing room.

12   111.    Instead of these custodial clients' FX trades being included with the others like

13   the Plaintiffs and subject to the extreme range of the day mark-up and mark-down, these clients

14   are allowed to deal directly with BNY Mellon – usually by phone in the afternoon – and are

15   given the chance to directly negotiate prices for their FX requirements for that day, every day,

16   despite their trades coming to the bank as standing instruction trades.

17   112.    As a result, the opt out custodial clients always receive better pricing than their

18   fellow custodial clients who are still subject to the bank's pricing schemes.

19   113.    BNY Mellon never disclosed to custodial clients like the Plaintiffs over the

20   period of time relevant to this Complaint its practice of providing certain clients the "opt out"

21   FX transactions, resulting in direct dealings on standing instruction trades.

22   114.    The number of custodial clients who receive "opt out" FX pricing is significant

23   enough for BNY Mellon to separately track the P/L (profit and loss) from the opt out group

24   when reporting FX revenue internally.

25   115.    In addition, for a period of time during the Plaintiffs' custodial relationship with

26   BNY Mellon, the bank provided better than range of the day pricing for a different particular

27   custodial client because it was concerned that this client had hired an FX trade specialist to

28   monitor its custodial FX costs, including BNY Mellon's pricing of FX for that fund.

116.     As a direct result of this knowledge, BNY Mellon priced this fund's standing instruction FX trades significantly better than the extreme range of the day pricing.  The Transaction Desk did not apply the full high and low of each day's range for this custodial client fund, providing this fund with performance superior to other custodial clients like Plaintiffs.

117.     Upon learning that this particular fund had not, in fact, hired an FX specialist, BNY Mellon instructed its management and Transaction Desk to "return to normal [*i.e.*, standing instruction] pricing" for this client.  The Transaction Desk confirmed that it would now "price these as normal."

118.     The funds that received either "opt out" or improved FX pricing for the custodial FX trades received better performance than other custodial clients like Plaintiffs for comparable standing instruction trades.

**H.**     **The Bank Promises But Does Not Deliver "Netting" of FX Trade Requirements**

119.     "Netting" allows funds that require FX trades to make one transaction instead of two, reducing costs.  When the same currency must be bought and sold, the two positions can be "netted," allowing for the transaction to be completed in one trade.  BNY Mellon told the Plaintiffs that it would net custodial FX trades.

120.     Despite this promise to the Plaintiffs, BNY Mellon failed to net the custodial FX trades, resulting in more transactions and correspondingly greater costs for Plaintiffs. These representations were false and fraudulent and made with the intent that the Plaintiffs rely on them in approving the false FX rates and prices assigned to its trades.

121.     Not only did BNY Mellon fail to net Plaintiffs' trades, the bank's Transaction Desk marked up or marked down *both* trades of the two transactions that were supposed to have been netted.

122.     BNY Mellon and Transaction Desk employees were aware of the bank's failure to offer netting of individual custodial clients' FX transactions.  As a result, Plaintiffs paid more for multiple transactions than single netted transactions would have cost.

**I.**     **The Bank Reaps Illicit Profits From FX Trades For its Custodial Clients**

     **1.**     **Examples of How Defendants' Fraudulent Foreign Exchange Scheme Works**

123.     Upon receipt of a request requiring a FX transaction, Defendants execute a trade to fill the request at the FX rate available at or close to that time.  Defendants thereafter watch the market fluctuation in FX rates related to such transactions over the course of the day in order to charge the client a different, less favorable rate than the one at which Defendants actually settled the FX transaction.  Many of the transactions for which Defendants claim or state an applicable FX rate that the Plaintiffs are responsible for paying (for "buy" transactions) or for which the Plaintiffs are entitled to a credit from Defendants (for "sell" transactions) are actually feigned.  Defendants falsely claim to have paid a different rate than that which was required to settle the trade.

124.     If the transaction is a "buy" of a foreign currency, Defendants will charge the Plaintiffs a higher FX rate available at another time in the day, which causes the Plaintiffs to pay more for the FX transaction than what Defendants actually paid.  Defendants will keep for themselves the difference between the true cost of the trade and the fictitious or false FX rate Defendants claim to have paid and charge to the clients.  If the transaction that requires a FX transaction is instead a "sale" of a foreign currency, Defendants will falsely credit the Plaintiffs with an FX rate available at another time in the day that is lower than what Defendants actually receive for the currency, and remit to the Plaintiffs an amount less than what Defendants actually have received on the behalf of the Plaintiffs.

     **2.**     **How the Bank Manipulates Pension Fund Clients**

125.     The great majority of FX trades are done without a built in commission or fee paid by the client in a transaction.  The profit that is gained by the Bank, or the sell side, is generated by dealing at a price with the client where they are able to offset the trade in the interbank market at a profit.  It is a zero sum game; whatever the Bank gains in profit in the transaction becomes a "loss" for or a cost to the client.  The fact that one side's gain is the other

1   side's cost can make the negotiating process key to overall profitability for both parties

2   involved.

3         126.    The method of dealing with FX transactions can be broken down into to two

4   basic categories: "Direct" or "Indirect."  In the "Direct" way of trading, clients do FX

5   transactions themselves or contract with a third party that executes their FX trades.  Generally

6   speaking, clients that choose to deal directly with the FX department will accept a price that

7   they negotiated with the Bank on a given transaction.  That FX price will be close to where the

8   actual FX market is trading at that time of day when the FX transaction is finalized.  Thus,

9   "Direct" clients are able to actively pursue the best price available to them at a particular time,

10   and such clients are protected from additional FX costs caused by volatility in FX rates, whether

11   such volatility occurs before or after the actual trade that the Direct client is assured of having

12   occurred.  For this reason, the Bank makes very modest profits on Direct trading, because the

13   FX rate that is agreed upon between the Bank and the client must be paid by the Bank, and it

14   has no opportunity to pretend that an FX rate that was much more costly for the client applied to

15   the transaction in question.

16         127.    The second way of executing foreign exchange transactions, one that is

17   predominately used by public pension fund custody clients, such as the Plaintiffs herein, is the

18   "Indirect" method.  Indirect foreign exchange trading at BNY Mellon is also referred to by the

19   Bank as "non-negotiated" and "Standing Instructions" dealing.

20         128.    The Indirect method involves the custodian, rather than the client, overseeing the

21   trade process from start to completion.  The client has little or no input in the FX transaction at

22   any point in the process.  In addition to the Bank's public descriptions above, the Indirect

23   methodology is also similarly described in BNY Mellon's FX business plan statement

24   ("Statement") for 2010:

25         Through our standing instruction [Indirect] channel, we provide significant value-added

26             to clients by identifying trade requirements, aggregating and netting exposures, handling

27             pre-trade administration for regulated market transactions, ***executing trades in***

28             ***accordance with best execution practices***, assuring settlement and reporting trade

1    details to back-end accounting systems – all of which allows us to apply **wider margins**

2    **with the willful acceptance of clients**.  (Emphases added).

3         129.    This statement is not only contradictory on its face (as the Bank's actions are

4    contrary to "best execution practices," and do not add "significant value") but shows that the

5    FX scheme alleged herein was knowing and willful.  The notion of Indirect clients accepting

6    "margins" also belies BNY Mellon's representation that Indirect trading is done "free of

7    charge," as described on Defendants' website (described *supra*).

8         130.    Profits from Indirect trading are at the heart of the Bank's decision-making

9    processes.  When the Bank competes for a custody client, the FX department is consulted and

10    asked to estimate what the Bank's profits will be when and if the Bank were to execute the

11    prospective client's FX transactions.  The Bank looks at what amount of international

12    investments the client presently has and how the Bank might price the deals, directly or

13    indirectly.

14         131.    The FX department will give the custody group a conservative estimate of what

15    the FX profit potential will be with the prospective client.  The custody group then incorporates

16    this estimate into their pricing structure as they make a flat-fee, all inclusive proposal (including

17    all FX costs and fees) to the prospective custodial client.  The FX department shares some of its

18    profits with the custody group because it understands how valuable the stream of Indirect

19    custodial deals will be to the FX department.

20         132.    When the Bank sells its custodial services to public pension funds, it does so in a

21    way to make it much more likely that the Plaintiffs will choose the Bank's bundled services,

22    which include the Indirect model of FX transactions.  The Bank prices the overall flat-rate

23    custody contract in such a way that it would seem foolish for the Plaintiffs – based on the

24    Bank's verbal and written (RFPS, contracts) representations and promises – to consider any

25    other option, *i.e.*, of taking its FX business elsewhere or paying someone else to do it.  Public

26    pension funds such as the Plaintiffs, as is well known by the Defendants who take advantage of

27    this knowledge, do not wish to employ the staff needed to directly negotiate FX transactions.

28    The Bank accordingly sells the bundled services as a way to promote efficiency and integration

1   of services, while, in reality, it only serves to facilitate the Bank's illicit FX profits.  On

2   information and belief, the Plaintiffs identified herein chose the Bank's bundled services, which

3   included Indirect FX services.

4          133.   Indirect public pension fund clients have relied on the Bank's representations

5   that Indirect foreign exchange trading actually uses "best execution practices," or, more

6   significantly, is provided to Indirect clients, "free of charge."  The duty of best execution

7   requires that a broker-dealer such as Defendants seek to obtain for its customer orders the most

8   favorable terms reasonably available under the circumstances.  That is, the duty of best

9   execution requires Defendants to execute trades at the best reasonably available price.

10         134.   The Bank not only failed to practice best execution practices, but went well

11  beyond what could be considered best practices by regularly picking a falsified FX price that

12  was unrelated to the actual FX transactions that had been engaged in by the Bank for the

13  Plaintiffs.

14         135.   Indirect clients are also known as ROD or "range of the day" clients where the

15  Bank uses the range of the day as part of its scheme to execute trades at the high or lows

16  depending on whether they are buyers or sellers.  The biggest variables in the Bank's

17  profitability are the amount of monies it processes and the volatility of the currency market.

18  The greater the volatility, the larger the range of falsified FX rates; the larger the range, the

19  greater ability of the Bank to price the clients at a rate that is more profitable to the Bank.

20         136.   BNY Mellon's system of executing FX trades and assigning fictitious FX rates

21  for Indirect pension fund clients was deliberately set up to leverage each day's trading volatility

22  in favor of the Bank and against the interest of custodial clients like Plaintiffs.  For instance, at

23  the beginning of the day there is a very narrow trading range for stocks and currencies when

24  compared with the end of the day.  If at the beginning of the day a BNY Mellon trader knows

25  that he has to purchase 1,000,000 Euros for a pension fund, the trader also knows that he does

26  not have to book that trade into the Bank's system until 5:00 p.m. that evening.  The trader has

27  been incentivized, *i.e.*, provided a high-paying, stress-free, large bonus job, by his employer, the

28  Bank, to wait to assign a fictitious FX rate for the trade to the Indirect client, although, in fact,

1    the trade may have been executed by the Bank to assure it of a cost of not more than the actual

2    cost of the FX at 10:00 a.m.

3         137.    BNY Mellon itself has noted that volatility in foreign currencies has contributed

4    to an increase in its FX revenues.  What it has not disclosed is that this is particularly true

5    because the Bank has taken undue advantage of such volatility to the disadvantage of its

6    customers.  By fixing its FX positions throughout the day at prices advantageous to the Bank,

7    the Bank cannot lose on a transaction.  At worst, the Bank breaks even.  To date, all that the FX

8    traders have thought that they need to do to shield their unlawful FX manipulations from

9    scrutiny by their Indirect clients, including public pension funds, is to price each FX trade for

10   the client within the range for that day.

11        138.    If the Plaintiffs had known of the Defendants' practices, they never would have

12   allowed them to occur and never would have hired Defendants to serve in a position of elevated

13   trust on behalf of the Plaintiffs.

14        **J.**      **A Step-by-Step Analysis of how the Bank Does FX Transactions and**
             **Commits Fraud against its Indirect Custody Clients**
15

16        139.    Indirect deals typically begin with the pension fund or its investment manager

17   informing the Bank's Asset Servicing department that an asset trade has taken place

18   necessitating an FX transaction to settle the trade, usually in the form of an Electronic Trade

19   Delivery notice (ETD).

20        140.    The ETD / fax / e-mail trade order communication is entered into the Cash

21   Management System ("CMS") by Asset Servicing within the Bank's custody operation (Bank

22   of New York's equivalent system is called "GSP").  This trade order will include the (a) client

23   name, (b) amount of foreign currency to be traded, (c) currency pair being traded (*e.g.*, buy

24   Japanese Yen and sell United States Dollars or sell Euros and buy United States Dollars),

25   (d) trade date and (e) time stamp of entry into the system.

26        141.    CMS then sends the trade order to the Bank's FX Trading System, "Charlie,"

27   where it is reviewed by the Transaction Desk.  At this point, the foreign exchange department of

28   the Bank is aware of the need to buy or sell the particular currency.  It would be the Indirect

1    client's reasonable and bargained-for expectation, consistent with best execution practices and

2    the Bank's fiduciary duty, that the trade then would occur close in time to its delivery into the

3    trading system.  However, as described further below, after the FX required is entered into

4    Bank's FX Trading System, the Bank's FX Traders watch for currency trends before executing

5    FX trades, and thereafter assign feigned or imaginary prices to the Indirect funds' trades for

6    which the client will be charged.

7           142.    The FX trader will do an actual trade, in the first instance, in order to satisfy his

8    or her long and short currency positions.  These trades are made based upon the volatility in the

9    market and the likely trend of the exchange rate.  The trader knows that he or she must satisfy

10   the buy and sell positions by a pre-determined cut-off time.  The Bank completes an FX trade,

11   but this trading is risk-free, since any market movement that goes against the Bank's positions

12   as a result of the watching and waiting, or as a result of an actual FX transaction, only comes

13   out of the Indirect client's pocket.  Rarely, if ever, will the Bank's traders assign to the pension

14   fund trade the FX rate actually obtained by the Bank at the time of the actual FX trade.  The

15   Bank usually uses 1:30 p.m. Eastern (New York) time as a cut-off, allowing the traders to fix

16   their long and short currency positions.

17          143.    After the cut-off time has passed and the Bank has made the actual FX

18   transactions necessary to cover the Indirect client's needs, the traders assign falsified FX rates

19   to those transactions, determined by looking back to the start of the trading day.  The

20   Defendants' FX Traders assign fictitious FX rates, a process called, "locking the rates," as

21   follows:

22                 A.     Higher prices to FX buy orders

23                 B.     Lower prices to FX sell orders

24          144.    The only limitation on this false pricing is that the Bank is careful, with some

25   exceptions, to price the trades within the actual high and low range of the day's FX rates.  This

26   is done to deceive anyone trying to audit  the Indirect client's FX transactions as carried out by

27   the Bank, as such audits typically only look to see if an FX transaction is priced within the

28   range of the day on which it occurred.

145.     Each Indirect client with a trade in a particular currency pair for that day receives the same FX rate, as determined by the Bank's cherry-picked range-of-the-day pricing, regardless of when their specific trade request came in to the Bank, the size of the trade, the time the actual FX trade occurred, and the actual FX rate at the time of that trade.

146.     Post-trade cash flow analyses are immediately done by the Bank to tabulate its profits from each completed trade (after the falsified FX rate has been assigned to the public pension fund client).  The profit from each transaction represents the difference between the falsely high (or low) price assigned to the Indirect client and the price the currency actually traded for and paid (or received) by the Bank.

147.     Profit and loss reporting is done by each transaction desk by the maintenance of a running Profit/Loss report that can be generated at any time.  The FX traders review this document in order to keep track of their personal Profit/Loss as well as the Bank's Profit/Loss. In addition, monthly reports are also generated.  Both the monthly and daily reports also show year-to-date reporting.

148.     End-of-month Client Custody Reports are prepared by the Bank on or before mid-month.  These reports list the pension fund's FX trades by date, amount, and price, *i.e.,* the fictitious FX rate (as reported to the custody side of the Bank by its FX traders).  These reports never contain time stamps and there is nothing on the report that would lead an Indirect client to suspect that it had been defrauded on its FX trades.

149.     By not showing the specific time of day at which the actual, as compared to the feigned, FX trade occurred, the Bank does not have to reveal that a trade it knew about at 10:00 a.m., and, therefore, should have executed near that time, has instead been assigned an FX rate that only occurred in the interbank market during mid- or late afternoon.

### K.     Legacy Mellon Transaction Desk Procedures

150.     Although the BNY/Mellon merger was effective as of July 1, 2007, the new entity has maintained the separate FX departments and each has traded throughout the day independent of the other (except for the end-of-the day reconciliation).  Thus, those custody clients such as the Plaintiffs that had previously hired BNY to be their custodian still have their

trades executed by the BNY FX desk; those custody clients that had previously hired Mellon to be their custodian still have their trades executed by the Mellon FX desk.

151.    On average, the Mellon FX desk receives around 2,600 trades a day, a significant number of which are Indirect trades, a good number of which are for large dollar amounts and become the major source for the traders' illicit FX scheme.  At the Mellon FX desk, Indirect transactions' volume totaled $5.375 billion in July of this year and $6.025 billion in August. The BNY FX desk processed a total of $6.580 billion in the same two months.  July and August are two of the slower months of the year for foreign exchange.

152.    The Mellon FX desk in Pittsburgh is manned by Sue Pfister, Paul Park, and Phyllis Bertok.  These three employees are individually responsible for specific currency pairs. Sue Pfister's primary currency is the euro (EUR).  Paul Park handles Swiss Francs (CHF), British Pounds (GBP), South African Rand (ZAR), and the Scandinavian currencies.  Phyllis Bertok focuses on the Canadian Dollar (CAD), Japanese Yen (JPY), Australian Dollar (AUD), New Zealand Dollar (NZD), and the minor Asian currencies.  As a group, the three are also responsible for a variety of emerging market currencies.

153.    Indirect deals are processed at the Mellon FX desk in the following manner:  the trades are delivered in the morning and are accepted up until a cutoff of around 1 to 1:30 PM. The cutoff time is enforced so the Mellon FX desk may get their illicit, feigned pricing of the deals done by the end of the day.  The longer a trade is held up in the system, the more time exists for volatility in the market and movement in the FX rates to facilitate greater profit to the Bank when the trades are eventually priced.  Typically, the trading desk has a time window of at least 6 hours in which they will choose the worst price possible for Indirect clients, such as the Funds, in each FX deal.

154.    As a general matter, Sue Pfister is the Mellon/Pittsburgh employee with the most knowledge of the Bank's FX operations.  She is the legacy Mellon representative involved in the process of putting one electronic trading system in place for the two legacy banks.  She knows about, and, in fact, orchestrates, the fraudulent FX scheme.

1

### L.      Legacy Bank of New York Procedures

2      155.   The basic elements of the fraud are the same with respect to both the Mellon FX

3  desk and the BNY FX desk.  Their respective procedures, as they relate to the fraud, were in

4  place before the merger.  Besides these general elements, the following specifics pertain to the

5  Bank of New York.

6      156.   BNY's electronic trading system, "GSP," is less sophisticated than Mellon's

7  CMS system.  As a consequence, more persons are needed to organize BNY's Indirect flow of

8  trades from the custody department to the BNY FX desk.  What CMS automates, *e.g.* the need

9  for the FX transaction and the parameters of the deal, has to be done manually by BNY staffers.

10  BNY does not employ a strict cut-off time for foreign exchange trades on the BNY FX desk.  It

11  will accept deals past Mellon's 1:00 to 1:30 PM cut-off.  A number of BNY staffers take the

12  Indirect deals and price them.  FX sales desk people, spot traders, and the BNY FX desk are all

13  involved.  In the afternoon, if there is remaining exposure from the Indirect deals that requires

14  trading, Bill Samella, the chief dealer in NYC, will walk around the BNY FX desk telling the

15  respective spot traders what they need to offset.

16      157.   It is also BNY's practice to occasionally take a deal in the New York morning

17  and price it using the range that has been observed in London time.  This practice allows a

18  much longer time frame from which to review and take advantage of the volatility of an FX

19  rate, and, as a consequence, take a bigger false FX spread from the Indirect client.

20      158.   Legacy BNY has been known to give money back when it has been caught by

21  clients pricing the Indirect deals at an exorbitant FX rate.  Specifically, BNY has on occasion

22  gone beyond the range of the day in pricing some deals and instead used the entire overnight

23  range as well in order to maximize profit.  This practice has been challenged, on occasion, by

24  Indirect clients.

25      ### M.      Indirect Trade Example

26      159.   An actual trade illustrates the alleged illicit profit-taking on Indirect FX trades:

27  On October 1st of this year, the electronic pipeline from CMS showed that the Bank's clients

28  would be selling to the Bank approximately $12,500,000 United States Dollars.  The Bank

1    would be selling them Canadian Dollars in return as they were obligated to pay for security

2    transactions that they had already entered into in Canada.

3        160.   The FX desk was aware of this net client exposure that would be offset that day

4    by 9:30 AM.  The USD/CAD had opened the New York morning at 1.0730 (where it would

5    take 1.0730 CAD to equal 1 USD).  The currency market fluctuated throughout the day 24/7

6    and the USD/CAD traded lower, ultimately making a low at 9:00 a.m. of 1.0682.  This rate,

7    1.0682, is the worst possible rate one would have received if selling USD and buying CAD in

8    the New York trading session.  From that low point the market traded higher and ultimately the

9    USD gained strength and made a high of 1.0847 in the afternoon.

10        161.   The FX desk sold $12,500,000 USD to the trader that covered the USD/CAD on

11    the spot desk, Pat O'Brien.  O'Brien covered the position at an average rate of 1.0795.  The rate

12    the clients that were selling the USD received was the very worst of the day: 1.0682.  There was

13    no risk on the Bank's side of this trade.  The profit of buying $12,500,000 USD/CAD at 1.0682

14    and selling the USD/CAD at 1.0795 was $134,937.50.  Had the clients negotiated this trade as a

15    Direct client instead of as an Indirect client, a "normal" profit might have been 5 to 10 pips (a

16    pip representing one point in market vernacular, *i.e.*, 1.0701 to 1.0706 is 5 pips).  A ten pip

17    spread on a $12,500,000 USD/CAD trade would represent a Bank profit that was $11,579 at

18    these rates.  This trade was instead hyper-priced to the client at 113 basis points.

19        162.   A fraudulent profit of this size is a common occurrence at the Bank.  In fact, the

20    majority of the Bank's FX profits are products of these Indirect trades.  In 2008, on the

21    Pittsburgh trading desk of BNY Mellon, foreign exchange produced $417,331,504 in profit for

22    the Bank.  The portion of this profit directly attributable to Indirect trades – as taken from the

23    Indirect line item on the Profit/Loss sheet for the year – was $298,055,320 or 71.4% of the total.

24        163.   For 2009, as of September 28, the Indirect foreign exchange profits accounted

25    for $189,226,774 of a total of $248,417,151 or 76.2%.  These totals are available on the Bank's

26    internal trading records - the Bank's FX accounting system known as "Charlie."  The deals are

27    also recorded in the CMS Internal Transaction Summary report.

28

## COUNT ONE

### Substantive Violations of the California False Claims Act

[Presentation of False or Fraudulent Claims for Payment or Approval]

164.     Plaintiffs repeat and incorporate by reference the allegations made in Paragraphs 1 through 163 of this Complaint.

165.     This is a claim for treble damages and penalties under the California False Claims Act.

166.     Through the acts described above, Defendants and their agents and employees knowingly presented or caused to be presented to an officer or employee of the Plaintiffs false or fraudulent claims for payment or approval in order to charge them false foreign exchange rates for foreign currency transactions

167.     The Plaintiffs, unaware of the falsity of the claims presented by Defendants and their agents and employees, paid and continue to pay Defendants for claims that would not be paid if the truth were known.

## COUNT TWO

### Substantive Violations of the California False Claims Act

[False Records or Statements to Get
False or Fraudulent Claims Paid or Approved by the Subdivisions]

168.     Plaintiffs repeat and incorporate by reference the allegations made in Paragraphs 1 through 163 of this Complaint.

169.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Plaintiffs.

170.     The Plaintiffs, unaware of the falsity of the records and statements made or used by Defendants and their agents and employees, paid and continue to pay Defendants for claims that would not be paid if the truth were known.

## COUNT THREE

### Substantive Violations of the California False Claims Act

[False Records or Statements to Conceal,
Avoid, or Decrease an Obligation to Pay or Transmit Money to the Subdivisions]

171.    Plaintiffs repeat and incorporate by reference the allegations made in Paragraphs 1 through 163 of this Complaint.

172.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the Plaintiffs.

173.    The Plaintiffs, unaware of the falsity of the records and statements made or used by Defendants and their agents and employees, allowed Defendants to withhold funds belonging to the Plaintiffs that the Plaintiffs would not have allowed to be withheld if the truth had been known.

174.    The Subdivisions and the Subdivision Funds, unaware of the falsity of the records and statements made or used by Defendants, were deprived of and continue to be deprived of payments owed to them by Defendants, which would not have occurred had the truth been known.

## COUNT FOUR

### Substantive Violations of the California False Claims Act

[Conspiracy]

175.    Plaintiffs repeat and incorporate by reference the allegations made in Paragraphs 1 through 163 of this Complaint.

176.    Through the acts described above, Defendants and their agents and employees conspired to defraud the Plaintiffs by getting false or fraudulent claims allowed or paid by the Plaintiffs.

177.    The Plaintiffs, unaware of the falsity of the claims presented by Defendants and their agents and employees, paid and continue to pay Defendants for claims that would not be paid if the truth were known.

178.     The Plaintiffs, unaware of the falsity of the records and statements made or used by Defendants, were deprived of and continue to be deprived of payments owed to them by Defendants, which would not have occurred if the truth had been known.

## COUNT FIVE

### Unjust Enrichment

179.     Intervening government entities repeat and reallege the allegations made in paragraphs 1 through 163 of this Complaint.

180.     As a result of their conduct as alleged herein, Defendants have in their possession money which in fairness ought to be paid to Intervening Government Entities.

181.     For reasons of fairness and justice, the law creates an obligation on the part of Defendants to return this money.

## COUNT SIX

### Breach of Contract

182.     Intervening government entities repeat and reallege the allegations made in paragraphs 1 through 163 of this Complaint.

183.     Intervening government entities entered into contracts with Defendants.

184.     Intervening government entities did all, or substantially all, of the significant things that the contracts required them to do.

185.     Defendants breached the contracts by, *inter alia*, setting fictitious FX rates to report and charge or credit to Plaintiffs for standing instruction FX trades, against the reasonable expectations of the Plaintiffs and in violation of the implied covenant of good faith and fair dealing, in order to unfairly and unjustifiably increase their profits at the expense of the Plaintiffs.   Defendants failed to keep proper records of these transactions in violation of their obligations as a means of preventing Plaintiffs from discovering the scheme alleged herein. Defendants created and proposed the so-called "range of the day" knowing that it was misleading, deceptive, and violated the contract because the range of the day did not accurately reflect foreign exchange prices which were available to the Plaintiffs.  Defendants failed to net foreign exchange transactions for the benefit of their custodial clients.   Defendants did not

1  exercise reasonable care in the execution of duties – much less the higher standard of care that

2  they committed to exercise – in engaging in FX standing instruction transactions.

3      186.    Defendants' conduct breached the implied promise of good faith and fair dealing

4  present in every contract.

5      187.    Plaintiff suffered damages as the result of the breach of contract.

6                              **COUNT SEVEN**

7                         **Breach of Fiduciary Duty**

8      188.    Intervening government entities repeat and reallege the allegations made in

9  paragraphs 1 through 163 of this Complaint.

10     189.    Defendants owed a fiduciary duty to Intervening Government Entities.

11     190.    This duty imposed an obligation on Defendants to act with the utmost good faith

12  in the best interests of Intervening Government Entities.

13     191.    In its dealings with the Intervening Government Entities, Defendants were held

14  to "something stricter than the morals of the market place. Not honesty alone, but the punctilio

15  of an honor the most sensitive, is then the standard of behavior . . . the level of conduct for

16  fiduciaries [has] been kept at a level higher than that trodden by the crowd."

17     192.    Defendant breached its fiduciary obligations to Intervening Government Entities

18  by knowingly acting against Intervening Government Entities' interests in conducting FX

19  transactions.

20     193.    Plaintiff did not give informed consent to this conduct.

21     194.    Plaintiff was harmed as a result of this conduct.

22     195.    Defendants' conduct was a substantial factor in causing Intervening Government

23  Entities' harm.

24                              **COUNT EIGHT**

25                         **Fraud by Concealment**

26     196.    Intervening Government Entities repeat and reallege the allegations made in

27  paragraphs 1 through 163 of this Complaint.

28     197.    Defendants and Intervening Government Entities had fiduciary relationships.

198.    Defendants intentionally failed to disclose important facts to Intervening Government Entities.

199.    Defendants disclosed some facts to Intervening Government Entities, but intentionally failed to disclose other important facts, thereby making the disclosure deceptive.

200.    The facts which Defendants intentionally failed to disclose were important, were known only to it, and Intervening Government Entities could not have discovered these facts.

201.    Intervening Government Entities did not know of the concealed facts.

202.    Intervening Government Entities reasonably relied on Defendants' deception.

203.    Intervening Government Entities were harmed.

204.    Defendants' concealment was a substantial factor in causing Intervening Government Entities' harm.

## COUNT NINE

## Violation of California Bus. & Prof. Code § 17200

205.    Intervening Government Entities repeat and reallege the allegations made in paragraphs 1 through 163 of this Complaint.

206.    Defendants' business practices as alleged herein constitute unlawful conduct in violation of the State False Claims Act.

207.    Defendants' business practices as alleged herein are unfair and fraudulent.

208.    Defendants' business practices as alleged herein violate Cal. Bus. & Prof. Code § 17200.

209.    As  a result of these violations, Defendants should be ordered to restore to Intervening Government Entities the monies which they have acquired through their violation of Cal. Bus. & Prof. Code § 17200.

**WHEREFORE:**

As a direct result of Defendants' false records, statements, claims, concealments and omissions, and conspiracies to commit such offenses, the Plaintiffs have been damaged in the amount of tens of millions of dollars in false and fraudulent foreign exchange charges or credits.

## **PRAYER**

Plaintiffs pray for judgment against Defendants as follows:

1.      That Defendants cease and desist from violating the Act.

2.      That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the Subdivisions and the Subdivision Funds have sustained as a result of Defendants' actions, as well as a civil penalty against each Defendant of $10,000 for each violation of the California False Claims Act.

3.      That Plaintiffs be awarded the maximum amount allowed pursuant to the California False Claims Act.

4.      That Plaintiffs be awarded all costs and expenses of this action, including attorneys' fees.

5.      That the Intervening Government Entities be awarded all allowable damages and remedies flowing from their claims.

6.      That an award of punitive damages be made against Defendants in favor of Intervening Government Entities.

7.      That the Subdivision Funds and Relator recover all such other relief as the Court deems just and proper.

/ / /

/ / /

/ / /

1    Dated: December 27, 2011        Respectfully submitted,

2                                 COTCHETT, PITRE & McCARTHY, LLP

3                                 By:      */s/ Steven N. Williams*
4                                        Steven N. Williams
Steven N. Williams (State Bar No. 175489)
swilliams@cpmlegal.com
5                                 Victor S. Elias (State Bar No. 262269)
velias@cpmlegal.com
6                                 COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
7                                 Burlingame, CA 94010
Telephone: 650-697-6000
8                                 Fax: 650-697-0577

9                                 Attorneys for Intervening Government Entities Los
Angeles County Employee Retirement Association, Los
10                                Angeles Department of Water & Power Retirement Plan,
San Diego County Employees Retirement Association,
11                                and Stanislaus County Employees Retirement Association

12
13                                LOS ANGELES COUNTY EMPLOYEES
RETIREMENT ASSOCIATION

14                                Robert S. Van Der Volgen (State Bar No. 155024)
Johanna M. Fontenot (State Bar No. 130673)
15                                Michael D. Herrera (State Bar No. 212783)

16                                Attorneys for Intervening Los Angeles County Employee
Retirement Association
17

18                                OFFICE OF THE LOS ANGELES CITY ATTORNEY

19                                Carmen A. Trutanich (State Bar No.  86629)
Alan L. Manning (State Bar No. 77285)
20                                Marie McTeague (State Bar No. 136841)

21                                Attorneys for Los Angeles Department of Water & Power
Retirement Plan
22

23                                LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

24                                By:        */s/ Lexi J. Hazam*
25                                        Lexi J. Hazam

26                                Richard M. Heimann (State Bar No. 063607)
*rheimann@lchb.com*
27                                Lexi J. Hazam (State Bar No. 224457)
*lhazam@lchb.com*
28                                Robert L. Lieff (State Bar No. 037568) (Of Counsel)
*rlieff@lchb.com*

1    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
     Embarcadero Center West
2    275 Battery Street, 29th Floor
     San Francisco, CA  94111-3339
3    Telephone:  415-956-1000
     Facsimile:  415-956-1008
4
     Steven E. Fineman (State Bar No. 140335)
5    *sfineman@lchb.com*
     Daniel P. Chiplock
6    *dchiplock@lchb.com*
     LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
7    250 Hudson Street, 8th Floor
     New York, NY  10013-1413
8    Telephone:  212-355-9500
     Facsimile:  212-355-9592
9
     Philip R. Michael
10   *prmpjab@gmail.com*
     MICHAEL LAW GROUP
11   326 West 246th Street
     Riverdale, NY  10471
12   Telephone:  917-689-1734
     Facsimile:  718-601-4052
13
     Michael P. Thornton
14   Michael A. Lesser
     *mlesser@tenlaw.com*
15   THORNTON & NAUMES LLP
     100 Summer Street, 30th Floor
16   Boston, MA  02110
     Telephone:  617-720-1333
17   Facsimile:  617-720-2445
18   Attorneys for Plaintiff/Relator
19
20
21
22
23
24
25
26
27
28

1

**DEMAND FOR JURY TRIAL**

2

Plaintiffs respectfully demand a jury trial for all alleged claims which are triable to a

3

jury.

4

Dated: December 27, 2011          Respectfully submitted,

5

COTCHETT, PITRE & McCARTHY, LLP

6

By:      /s/ Steven N. Williams
             Steven N. Williams

7

8

Steven N. Williams (State Bar No. 175489)
swilliams@cpmlegal.com
Victor S. Elias (State Bar No. 262269)

9

velias@cpmlegal.com
COTCHETT, PITRE & McCARTHY, LLP

10

840 Malcolm Road
Burlingame, CA 94010

11

Telephone: 650-697-6000
Fax: 650-697-0577

12

Attorneys for Intervening Government Entities Los

13

Angeles County Employee Retirement Association, Los
Angeles Department of Water & Power Retirement Plan,

14

San Diego County Employees Retirement Association,
and Stanislaus County Employees Retirement Association

15

16

LOS ANGELES COUNTY EMPLOYEES
RETIREMENT ASSOCIATION

17

Robert S. Van Der Volgen (State Bar No. 155024)

18

Johanna M. Fontenot (State Bar No. 130673)
Michael D. Herrera (State Bar No. 212783)

19

Attorneys for Intervening Los Angeles County Employee

20

Retirement Association

21

OFFICE OF THE LOS ANGELES CITY ATTORNEY

22

Carmen A. Trutanich (State Bar No.  86629)

23

Alan L. Manning (State Bar No. 77285)
Marie McTeague (State Bar No. 136841)

24

Attorneys for Los Angeles Department of Water & Power

25

Retirement Plan

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

By:    _____*/s/ Lexi J. Hazam*_____
Lexi J. Hazam

Richard M. Heimann (State Bar No. 063607)
*rheimann@lchb.com*
Lexi J. Hazam (State Bar No. 224457)
*lhazam@lchb.com*
Robert L. Lieff (State Bar No. 037568) (Of Counsel)
*rlieff@lchb.com*

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Steven E. Fineman (State Bar No. 140335)
*sfineman@lchb.com*
Daniel P. Chiplock
*dchiplock@lchb.com*
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

Philip R. Michael
*prmpjab@gmail.com*
MICHAEL LAW GROUP
326 West 246th Street
Riverdale, NY  10471
Telephone:  (917) 689-1734
Facsimile:  (718) 601-4052

Michael P. Thornton
Michael A. Lesser
*mlesser@tenlaw.com*
THORNTON & NAUMES LLP
100 Summer Street, 30th Floor
Boston, MA  02110
Telephone:  (617) 720-1333
Facsimile:  (617) 720-2445

Attorneys for Plaintiff/Relator

1

## **ATTESTATION OF FILING**

2          Pursuant to N. D. Cal. General Order No. 45, section 45 X(B), I hereby attest that

3   concurrence in the filing of thi document has been properly obtained.

4                                              /s/ Steven N. Williams
                                          Steven N. Williams
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28